David B. Miller
Texas Bar No. 00788057
david@schneidlaw.com
SCHNEIDER MILLER REYNOLDS, P.C.
300 N. Coit Road, Suite 1125
Richardson, Texas 75080
Telephone: (972) 479-1112
Facsimile: (972) 479-1113

T. Micah Dortch
Texas Bar No. 24044981
micah@dll-law.com
Dortch Lindstrom Livingston Law Group
2613 Dallas Parkway, Suite 220
Plano, Texas 75093
Telephone: 214-252-8258
Facsimile: 888-653-3299

*Special Counsel for the Trustee Areya Holder Aurzada*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: § | CASE NO. 22-30500-swe7 | |
| DENNIS JAMES ROGERS II, § | | |
|     Debtor. § | CHAPTER 7 | |

| | | |
|---|---|---|
| AREYA HOLDER AURZADA, § | | |
| CHAPTER 7 TRUSTEE FOR THE § | | |
| BANKRUPTCY ESTATE OF § | | |
| DENNIS JAMES ROGERS II § | | |
|     Plaintiff, § | | |
| § | | |
| v. § | Adversary No. 24-03028 | |
| § | | |
| FUNDERZ.NET, LLC, § | | |
|     Defendant. § | | |

**SECOND AMENDED COMPLAINT TO AVOID AND RECOVER
FRAUDULENT TRANSFERS**

    **COMES NOW**, Areya Holder Aurzada ("Trustee" or "Plaintiff") in her capacity as

SECOND AMENDED COMPLAINT TO AVOID AND
RECOVER FRAUDULENT TRANSFERS                                          Page 1

Chapter 7 Trustee for Dennis James Rogers II ("Debtor" or "Rogers") and files this her *Second Amended Complaint to Avoid and Recover Fraudulent Transfers* (the "Second Amended Complaint") and, in support, would respectfully show the Court as follows:

## NATURE OF THE ACTION

1. This adversary proceeding is brought by the Trustee against Funderz.net, LLC ("Funderz" or "Defendant") to avoid and recover an actual fraudulent transfer made by the Debtor to the Defendant.

## PARTIES

2. Plaintiff is the duly appointed trustee of the Debtor in the above-captioned bankruptcy case.

3. Funderz has been served, has filed a Motion to Dismiss [Dkt. 5] and may be served through its counsel of record.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") because the claims and causes of action asserted in the Complaint arise under Title 11 of the U.S. Code (the "**Bankruptcy Code**") and arise in and are related to a case filed under title 11 and pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division under Case No. 22-30500.

5. Funderz regularly conducts business in this state and specifically engaged with Texas residents regarding the subject matter of these claims.

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The claims and causes of action set forth herein concern the avoidance and recovery of claims under 11 U.S.C. §§ 544, 548 and 550, *inter alia*, of the Bankruptcy Code. Accordingly, this adversary proceeding is a "core" proceeding to be heard and determined by the Bankruptcy Court pursuant to 28 U.S.C. § 157(b).

8. The Plaintiff consents to entry of final orders by the Bankruptcy Court for all matters over which the Court has jurisdiction in this proceeding.

## BANKRUPTCY PROCEEDING

9. On March 22, 2022, an involuntary petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code. On March 28, 2022, this Court entered an order for the United States Trustee to appoint an interim Chapter 7 Trustee (Dkt. No. 16). Thereafter, the Trustee was appointed as the interim Chapter 7 Trustee. On April 26, 2022, this Court entered an order for relief against the Debtor under Chapter 7 (Dkt. No. 33). The Trustee continues to serve as the permanent Chapter 7 Trustee.

## BACKGROUND

A. **Rogers and the Shell Entities**

10. In 2017 and 2018, Rogers set up at least five (5) different shell corporations – Organ Mountain Energy, LLC; OMTC, Inc.; Nomad Development, LLC; Bootstrap Ventures, LLC, and Push Start Industries, LLC (collectively, the "Shell Entities").

11. Rogers was the sole owner of the Shell Entities. Investigation to date indicates no employees in any of the Shell Entities. Other than the original operating agreements, there are only a handful of corporate records of any type.

12. The banking records indicate that there was literally no distinction between or among the deposits and distributions made from Rogers' personal accounts and the accounts of the Shell Entities. Rogers and the Shell Entities used six different banks or brokerage firms. Rogers and the Shell Entities had 28 traditional banking accounts and another 20 brokerage accounts. On a weekly if not daily basis, Rogers transferred money between Shell Entity accounts and his personal account. The Shell Entities paid each other's debts and expenses and paid Rogers' debts and expenses. Even suggestions of any material underlying business in the bank records has proven to be false. By way of example, OMTC had significant transfers to and from an entity named Site Development Group. The CEO of Site Development Group recently reached a plea agreement in California for securities fraud and, of course, running a Ponzi scheme.

13. Rogers undeniably controlled the bank accounts. As the Fifth Circuit has determined, "control over funds in an account is the predominant factor in determining an account's ownership." *In re IFS Financial Corp.*, 669 F.3d 255, 262-63 (5th Cir. 2012) (citing *In re Southmark*, 49 F.3d 1111, 1113-14 (5th Cir. 1995)). In this case, Rogers was the only party who could make deposits or withdrawals from any of the accounts. Rogers had total discretion to pay creditors of any Shell Entity out of the account of any Shell Entity. Indeed, the accounts, including the accounts identified below, bore the name of a Shell Entity only to further the scheme described herein. Rogers maintained full possession and control of the funds. Rogers was not merely the "unseen hand" that exercised control, he was the very visible hand that exercised control. *Id.* at 262 (citations omitted). Rogers considered the funds in the accounts in the names of the Shell Entities to be his funds such that payments from those accounts diminished his estate and left less money to pay to creditors.

14. Without acknowledging that it is necessary under the facts and causes of action contained herein, the Trustee pleads that each Shell Entity functioned as an alter ego of Dennis Rogers. Specifically, each Shell Entity was organized and operated as a mere tool or business conduit for Rogers, there was such unity between the Shell Entities and Rogers that the separateness of the corporations ceased, and holding only the corporations liable would result in an injustice. *See, e.g.*, *Durham v Accardi*, 582 S.W.3d 179, 185 (Tex. App.-Houston [14th Dist.] 2019, no pet.).

**B.     How the Scheme Worked**

15. For reasons understood only by those who have run Ponzi schemes, Rogers thought using the Shell Entities to conduct a Ponzi scheme and launder money was a good idea. Rogers pitched two fraudulent products – (1) buying and selling water rights and (2) flipping fuel that he claimed he could purchase wholesale or at auction. (The water rights product was likely a function of the fact that Dennis Rogers, *Sr.* had experience and success in selling water rights. Rogers was happy to have investors think he was his father.)

16. While Rogers had two different products/promotions/lies, he operated the scheme as a single business operation. Rogers did not pay back investors according to the product they invested in or according to the name on the promissory notes. The investments, repayments, and products were fungible.

17. In the course of the fraudulent scheme, Rogers misrepresented material facts, knowingly or recklessly without knowledge of their truth, with the intent that investors rely upon those misrepresentations and, indeed, investors did rely upon his misrepresentations. More specifically, as set out in some detail in Exhibit 1, incorporated herein:

**Who Made the Representation:** Rogers ;

**What Did He Misrepresent:** Supposed unique opportunities for quick profits relating to oil and gas or water rights. Rogers showed investors fictitious contracts, correspondence and even bank wires. As to Funderz, the misrepresentations regarded fuel contracts;

**When:** the earliest representations to investors appear to be in late 2017 or early 2018 and these representations continued with various investors up until the filing of this bankruptcy in March of 2022. Upon information and belief, the solicitation of Funderz and the misrepresentations to Funderz were on or about August 2019;

**Where:** Rogers operated the scheme from offices in Dallas but, on at least one occasion, travelled to New York for a meeting with representatives of Funderz;

**How the Representations were False:** Again, as set forth partially in Exhibit 1, Rogers did not have fuel contracts, water rights, or other contractual rights as represented to investors; and

**Why/What Did Rogers Gain:** Until the scheme unraveled, Rogers gained millions of dollars from duped investors to fund a lavish lifestyle and perpetuate a fraudulent scheme. From Funderz, he obtained the largest contribution into his scheme.

18. The investment was typically documented by a promissory note, loan agreement, or purchase order, with one of the Shell Entities and a guaranty by Rogers. The investments shared the common denominator of a promise for potential quick and significant return.

19. The existence of a promissory note, standing alone, is not dispositive of whether funds provided to Rogers are viewed as investments or loans. Rogers told investors that they were getting access to unique and special *investments*. The intent of the parties was to engage in an investment opportunity. By way of example, the transaction with Funderz was hardly a traditional loan. Funderz was to receive significant payments based on the success of the fraudulent scheme.

20.  Terms such as "interest" and "loan" do not end the inquiry regarding the nature of the transaction.  Indeed, the original scheme involving Charles Ponzi used ***promissory notes*** to provide the typical false sense of security in a Ponzi scheme.

> [Ponzi] borrowed the money on his credit only.  [Ponzi] spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war.  [Ponzi] was willing, he said, to give others the opportunity to share with him this profit.  By a written promise in 90 days to pay them $150 for every $100 loaned, he induced thousands to lend him.

*Cunningham v. Brown*, 265 U.S.1 (1924).

21.  In fact, however, there was no business that appears to have generated any income.  There appear to be no water rights and no fuel contracts.  Instead, early investors were paid back by later investors and those payments to early investors then spawned additional investors or a second investment from the same investor.  By way of example, Anthony and Joanne Capano, Ellis Guilbeau, Kenneth Guilbeau, John and Rhonda Harris, John Hughes, and Troya Montgomery received payments on their investments.  Some investors received payments, made additional investments and, thus, remain creditors of Rogers.  At no time did Rogers or the Shell Entities have the ability to pay investors absent perpetuating the fraud getting money from new investors.  That Rogers turned to a hard money lender like Funderz to keep the scheme alive is not surprising.

22.  Rogers has plead guilty to securities fraud and admitted that he used funds from investors to pay other investors, purchase real estate, and pay his personal expenses. "See Exhibit 1 Factual Resume of Dennis Rogers in Case No. 3-24CR0170-K.  Exhibit 1 is included  as a public record to show background facts consistent with the Amended Complaint and not intended to convert any Motion to Dismiss into a motion for summary judgment. *See, e.g., Little Gem Life Sciences,*

*LLC v. Orphan Med. Inc.*, 537 F.3d. 913, 916 (8th Cir. 2008).

    **C.**    **Funderz Invests and Recovers**

23. Funderz may be accurately described as a "hard money" lender that attracts desperate people looking for a lack of scrutiny.

24. In 2019, Funderz agreed to provide funds to OMTC for the purchase of ultra-low sulfur diesel fuel. Funderz provided money to a Ponzi scheme, something they knew by the time they were eventually paid back. Funderz and OMTC executed a series of promissory notes with collateral assignments, security agreements, and guarantees from Rogers. The loans had extraordinary fees. Indeed, Funderz admits that it loaned $10,000,000.00 and recovered at least $11,5000,000.00 and, remarkably believes it has been "duped" by Rogers and should have recovered in excess of $15 million.

25. The repayment of the principal loan proceeds is the "Principal Transfer". The repayment of any amount beyond the principal is the "Interest Transfer." Collectively, the "Principal Transfer" and the "Interest Transfer" are the "Transfers." The payment of the Transfers was consistent with the unity between Rogers and the Shell Entities. Funderz was paid back from seven different accounts including two different Rogers' personal accounts. Consistent with the lack of separation as to the investment products in the overall scheme, Funderz was paid back in part with investor funds from Bootstrap bank accounts. Bootstrap was the vehicle Rogers used to promote the water rights promotion. Funderz was repaid in part by Bootstrap. Clearly, Funderz was not concerned with names on bank accounts.

26. From bank records the Trustee has reviewed to date, Funderz received multiple payments from on or about January 27, 2020 through at least August 12, 2020 with the bulk of

payments being within two years of the original Complaint. Funderz or its counsel received payments from:

| Payments to Counsel for Funderz, Padfield & Stout | | | | | |
|---|---|---|---|---|---|
| **Date** | **Bank** | **Acct** | **Entity on Acct** | **Amt** | **Source/Destination** |
| 2/18/2020 | Chase | 1503 | Dennis Rogers Checking | -25,000.00 | Padfield & Stout Trust Acct |
| 2/18/2020 | Chase | 1503 | Dennis Rogers Checking | -1,500,000.00 | Padfield & Stout Trust Acct |
| 3/3/2020 | Chase | 1503 | Dennis Rogers Checking | -100,000.00 | Padfield & Stout Trust Acct |
| 6/25/2020 | Chase | 1503 | Dennis Rogers Checking | -100,000.00 | Padfield & Stout Trust Acct |
| 7/17/2020 | Chase | 1503 | Dennis Rogers Checking | -500,000.00 | Padfield & Stout Trust Acct |
| 7/17/2020 | Chase | 1503 | Dennis Rogers Checking | -500,000.00 | Padfield & Stout Trust Acct |
| 7/23/2020 | Chase | 1503 | Dennis Rogers Checking | -500,000.00 | Padfield & Stout Trust Acct |
| 7/30/2020 | Chase | 1503 | Dennis Rogers Checking | -500,000.00 | Padfield & Stout Trust Acct |
| 8/21/2020 | Chase | 1503 | Dennis Rogers Checking | -325,000.00 | Padfield & Stout Trust Acct |
| 9/4/2020 | Chase | 1503 | Dennis Rogers Checking | -425,000.00 | Padfield & Stout Trust Acct |
| 9/18/2020 | Chase | 1503 | Dennis Rogers Checking | -250,000.00 | Padfield & Stout Trust Acct |
| 9/22/2020 | Chase | 1503 | Dennis Rogers Checking | -150,000.00 | Padfield & Stout Trust Acct |
| 2/27/2020 | Chase | 7879 | OMTC, Inc. Checking | -100,000.00 | Padfield & Stout Trust Acct |
| 8/28/2020 | Chase | 8315 | Bootstrap Ventures Checking | -650,000.00 | Padfield & Stout Trust Acct |
| 9/14/2020 | Chase | 8315 | Bootstrap Ventures Checking | -600,000.00 | Padfield & Stout Trust Acct |
| 9/24/2020 | Chase | 8315 | Bootstrap Ventures Checking | -500,000.00 | Padfield & Stout Trust Acct |
| 9/29/2020 | Chase | 8315 | Bootstrap Ventures Checking | -200,000.00 | Padfield & Stout Trust Acct |
| 10/13/2020 | Chase | 8315 | Bootstrap Ventures Checking | -200,000.00 | Padfield & Stout Trust Acct |
| 10/21/2020 | Chase | 8315 | Bootstrap Ventures Checking | -200,000.00 | Padfield & Stout Trust Acct |
| 7/10/2020 | Goldman | 3052 | Dennis Rogers Trade | -500,000.00 | Padfield & Stout Trust Acct |
| 8/6/2020 | Goldman | 3052 | Dennis Rogers Trade | -500,000.00 | Padfield & Stout Trust Acct |
| 8/21/2020 | Frost | 2223 | OMTC, Inc. Checking | -200,000.00 | Padfield & Stout Trust Acct |
| 8/12/2020 | Frost | 9321 | Dennis Rogers Personal | -500,000.00 | Padfield & Stout Trust Acct |
| | | | | | |
| **Payments to Hop Capital**[1] | | | | | |

---

[1] From public records in other lawsuits, Hop Capital is a d/b/a of Funderz.

SECOND AMENDED COMPLAINT TO AVOID AND
RECOVER FRAUDULENT TRANSFERS                                                                                          Page 9

| Date | Bank | Acct | | Amt | Source/Destination |
|---|---|---|---|---:|---|
| 1/27/2020 | Chase | 7879 | OMTC, Inc. Checking | -700,000.00 | Hop Capital |
| 1/27/2020 | Chase | 7879 | OMTC, Inc. Checking | -200,000.00 | Hop Capital |
| 5/19/2020 | Chase | 7879 | OMTC, Inc. Checking | -250,000.00 | Hop Capital |
| 10/31/2019 | Chase | 8909 | Organ Mountain Energy | -900.00 | Hop Capital |
| 11/30/2019 | Chase | 8909 | Organ Mountain Energy | -3,420.00 | Hop Capital |
| 12/31/2019 | Chase | 8909 | Organ Mountain Energy | -3,962.00 | Hop Capital |
| 1/31/2020 | Chase | 8909 | Organ Mountain Energy | -4,702.00 | Hop Capital |
| 2/28/2020 | Chase | 8909 | Organ Mountain Energy | -2,540.00 | Hop Capital |

These payments total less than the $11.5 million Funderz has repeatedly acknowledged receiving. Funderz, of course, has the details of all payments received from Rogers or the Shell Entities and that will be a matter for discovery. To be clear, the Trustee seeks recovery of interest and principal from the transfers above and any other transfer Funderz received from Rogers or the Shell Entities arising out of the scheme and loans described herein.

    D.    **The Ponzi Presumption and Inquiry Notice**

27.    Texas and the Fifth Circuit recognize that:

> When a Ponzi scheme is involved, however, courts applying TUFTA analogues have bypassed the statutory badges-of-fraud analysis in favor of a conclusive presumption that transfers in furtherance of the scheme were made with actual intent to defraud. Such transfers are fraudulent per se, the theory goes, based on the enterprise's illegality and incipient insolvency, which is also conclusively presumed.

*Janvey v. Golf Channel, Inc.*, 487 S.W.3d 566, 567 (Tex. 2016).

The Trustee affirmatively pleads that for any cause of action that may require actual fraudulent intent as an element or condition, the Ponzi presumption should apply in this case.

28.    Thus, if there is a Ponzi scheme , the Court may presume actual intent. Further, if Funderz was on "inquiry notice", the Trustee may claw back interest and principal. Repayment

of principal may be recovered when a party "takes property with knowledge of such facts that would excite the suspicions of a person of ordinary prudence …regarding the fraudulent nature of an alleged transfer." *See Janvey v. GMAG, LLC* 592 S.W. 3d 125, 130 (Tex. 2019) (citations omitted). There is no good faith or other defense under this "inquiry notice" standard. Further, it does not appear that the recovery of principal is limited to inquiry notice of a Ponzi scheme, but inquiry notice of "the fraudulent nature" of the transfer. *Id.*

29. Circumstances, even before any discovery in this case, show that Funderz was on inquiry notice. The bulk of the Transfers was made after Funderz filed suit against Rogers and OMTC in Dallas County state court. At that time, there were multiple other suits pending against Rogers and the Shell Entities in Dallas County and other venues. Funderz, even before conducting discovery and finding very specific evidence of a fraudulent scheme as set out in their amended petitions in state court, knew that Rogers never purchased the diesel fuel referenced in the loans and, instead, used their cash for other purposes. At some later point, as set forth in their amended petitions, Funderz specifically knew that Rogers used their funds to pay other investors and stated so in sworn pleadings. Indeed, Funderz had the bank records showing that activity.

## CAUSES OF ACTION

A. **Avoidance of Actual Fraudulent Transfers—11 U.S.C. § 548(a)(1)(A)**

   1. **Actual Intent Based on an Admission**

30. Rogers made transfers to Funderz with the actual intent to hinder, delay, or defraud creditors to whom Rogers was already indebted or to whom he would become indebted. Specifically, the transfers to Funderz delayed and/or hindered payments to other creditors as Funderz was paid with money from other creditors without underlying sources of income other

than investors. Rogers knew with each payment that he would be less likely to be able to pay his other creditors. Further, upon information and belief, Rogers will admit actual intent.

### 2. Actual Intent Based on the Operation of a Ponzi Scheme

31. The Trustee incorporates the allegations contained in the preceding paragraphs of the Complaint as if set forth fully herein. The Trustee asserts that the Ponzi Presumption applies and actual fraud is conclusively presumed. Further, the Trustee asserts that Exhibit 1 is an admission of a Ponzi Scheme.

### 3. Actual Intent Based on the Badges of Fraud

32. The Fifth Circuit recognizes certain badges of fraud that tend to evidence actual intent under Section 548:

> (1) The lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (citations omitted).

33. Here, at least three of the *Soza* factors would be satisfied. Whether Rogers was operating a Ponzi scheme or not, bank records indicate that the financial condition of the operation as a whole was insolvent at all times. At no point during the scheme, could Rogers or any entity that he controlled have satisfied all of their obligations. Each new investor only added to debt.

34. The cumulative effect or series of transactions or course of conduct reflect a

pattern of deceit. As Funderz has acknowledged in pleadings in the state court case, Rogers had pending suits and ongoing threats from creditors even as he continued to make the transfers at issue.

35. The general chronology of events and transactions point to actual intent to hinder, delay or defraud creditors. Whether the Court determines that Rogers operated a Ponzi scheme or not (and the Trustee certainly believes that Rogers did operate a Ponzi scheme), Rogers has confessed to securities fraud and has confessed to making transfers that served no purpose other than to perpetuate a fraud. While that may not, in and of itself, create the Ponzi presumption, operating a fraudulent scheme is indicia of actual intent.

36. In his 2004 Examination, Rogers asserted the 5th Amendment rather than answer direct questions regarding whether he operated a Ponzi scheme and committed fraud. Such assertion of the 5th may lead to an adverse inference and supports a pleading of actual intent at this stage.

37. Finally, the Bankruptcy Code includes an indicia of fraud when transfers are made "for the benefit of" an insider. In this case, upon information and believe, Rogers made the payments to Funderz for the safety of himself and his family in reaction to express threats by Funderz.

38. By reason of the foregoing, the Trustee is entitled to an order and judgment that any of the Transfers paid within 2 years of the Petition date are avoided under section 548 of the Bankruptcy Code.

### B. Avoidance of Actual Fraudulent Transfers—Tex. Bus. & Comm. Code § 24.005(a)(1) through 11 U.S.C. §§ 544(b)(1)

39. The Trustee incorporates the allegations contained in the preceding paragraphs of the Complaint as if set forth fully herein.

40. Under 11 U.S.C. § 544(b)(1), the Trustee may avoid any transfer of an interest of the Debtor that is avoidable under applicable state law by a creditor holding an unsecured claim allowable under 11 U.S.C. § 502.

41. At the time the Transfers were made, other creditors of the Debtor held unsecured claims allowable under 11 U.S.C. § 502.

42. As such, the Trustee moves to avoid the Transfers because the Transfers could have been avoided by the Debtor's other creditors under Texas fraudulent transfer law. *See* TEX. BUS. & COM. CODE § 24.005(a)(1), including, but not necessarily limited to, Debra Van Cleve, Angela Garbiso, and Steven Webster.

### 1. Actual Intent Based on an Admission

43. Rogers made transfers to Funderz with the actual intent to hinder, delay, or defraud creditors to whom Rogers was already indebted or to whom he would become indebted. Specifically, the transfers to Funderz delayed and/or hindered payments to other creditors as Funderz was paid with money from other creditors without underlying sources of income other than investors. Rogers knew with each payment that he would be less likely to be able to pay his other creditors. Further, upon information and belief, Rogers will admit actual intent.

### 2. Actual Intent Based on the Operation of a Ponzi Scheme

44. Because Rogers and the Shell Entities operated as a Ponzi scheme, Texas law provides that the Transfers were made with an actual intent to hinder, delay, or defraud creditors.

### 3. Actual Intent Based on Badges of Fraud

45. In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

    (1)    the transfer or obligation was to an insider;
    (2)    the debtor retained possession or control of the property transferred after the transfer;
    (3)    the transfer or obligation was concealed;
    (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
    (5)    the transfer was substantially all the debtor's assets;
    (6)    the debtor absconded;
    (7)    the debtor removed or concealed assets;
    (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
    (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
    (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and
    (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Comm. Code § 24.005(b).

46. In the alternative, the Transfer was made with the actual intent to hinder, delay, or defraud the Debtor's other creditors because, among other things:

(a) before the Transfer was made, the Debtor had been sued or threatened with suit;

(b) the Debtor was insolvent or became insolvent shortly after the Transfer was made or the obligation was incurred;

(c) the Debtor removed or concealed assets by, among other things, diverting funds from the alleged operating business entities and purchasing lavish personal gifts not known from any examination of the borrowing entity; and

(d) the Transfer consisted of monies obtained through the fraud of the Debtor and the Debtor's other creditors.

47. By reason of the foregoing, the Debtor's other creditors have the right to avoid the Transfers under Section 24.005(a)(1) of the Texas Business and Commerce Code, and the Trustee can seek to enforce that right under section 544(b)(1) of the Bankruptcy Code. The Trustee is therefore entitled to recover all assets wrongfully transferred to the Defendants in the form of the Transfers. To be clear, the Trustee seeks to avoid and recover the Interest Transfer and the Principal Transfer as Funderz was on Inquiry Notice of the fraudulent nature of the transaction.

  C. **Recovery of Fraudulent Transfers—11 U.S.C. § 550(a)**

48. The Trustee incorporates the allegations contained in the preceding paragraphs of the Complaint as if set forth fully herein.

49. Pursuant to 11 U.S.C. § 550(a), to the extent that a transfer is avoided under 11 U.S.C. §§ 544 and 548, *inter alia*, the Trustee may recover for the benefit of the Bankruptcy Estate the property transferred or the value of such property from (a) the initial transferee of such transfer or the entity for whose such transfer was made or (b) any immediate or mediate transferee of such initial transferee.

50. The Defendant in this case is either the (a) initial transferee of the Transfer, the entity for whose benefit the Transfer was made, or (b) an immediate or mediate transferee of the initial transferee.

51. By reason of the foregoing, the Trustee is entitled to recover the Transfers under section 550(a) of the Bankruptcy Code for the benefit of the Debtor's estate and creditors. To be clear, the Trustee seeks to avoid and recover the Interest Transfer and the Principal Transfer as Funderz was on Inquiry Notice of the fraudulent nature of the transaction.

**D.    Attorney's Fees**

52. Under the applicable Texas fraudulent transfer law, the Court may award costs and reasonable attorney's fees "as are equitable and just." *See* TEX. BUS. & COMM. CODE § 24.013.

53. By reason of the foregoing, the Trustee is entitled to recover her costs and reasonable attorney's fees in her claims against the Defendant.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Plaintiff, Areya Holder Aurzada, respectfully prays that this Court:

(a) Enter judgment in the Trustee's favor on all cause of action asserted in the Complaint;

(b) Avoid the Transfers as actual fraudulent transfers under Section 548 of the Bankruptcy Code;

(c) Avoid the Transfers as actual fraudulent transfers under sections 24.005(a)(1) and 24.005(a)(2) of the Texas Business and Commercial Code through Section 544(b)(1) of the Bankruptcy Code;

(d) Award the Trustee judgment against Defendant in the amount of $11,500,000.00 or such amount as proven at trial under Section 550 of the Bankruptcy Code;

(e) Award the Trustee judgment against Defendant for all costs of suit incurred herein, including attorney's fees pursuant to section 24.013 of the Texas Business and Commercial Code;

(f) Award the Trustee pre- and post-judgment interest on the judgment amount to the

fullest extent allowed by applicable law; and

(g) For such other and further relief as the Court may deem just and proper.

Dated: March 3, 2025

Respectfully submitted,

By: */s/ David B. Miller*
David B. Miller
Texas Bar No. 00788057
david@schneidlaw.com
SCHNEIDER MILLER REYNOLDS, P.C.
300 N. Coit Road, Suite 1125
Richardson, Texas 75080
Telephone: (972) 479-1112
Facsimile: (972) 479-1113
and
T. Micah Dortch
micah@dll-law.com
Dortch Lindstrom Livingston Law Group
2613 Dallas Parkway, Suite 220
Plano, TX 75093
Telephone: 214-252-8258
Facsimile: 888-653-3299

***Special Counsel for the Trustee***